Consolidated Electric Storage Co. *v.* Atlantic Trust Co.

The Consolidated Electric Storage Company

*v.*

The Atlantic Trust Company.

1. Prior to the enactment of the twenty-eighth section of the Chancery act (*Rev. p. 109*), no decree, affecting the rights of a defendant, could be made until he had appeared and answered.

2. But now, under section 28, such decree may be made against a defendant, who, after jurisdiction has been acquired over him in any methods authorized by law, fails to appear, as shall be equitable and just upon the facts stated in the complainant's bill, either on his confession arising out of his failure to appear and make defence, or on proofs taken *ex parte*.

3. But a decree so made may be opened at any subsequent time, in order to prevent fraud or mistake.

4. A decree founded on a bill which shows no right of action in the complainant against the defendant, in respect to the subject-matter of the suit, is invalid.

5. Such a decree, like a judgment which is entirely outside of the cause of action specified in the pleadings in the suit in which it is pronounced, is a nullity, and will be so treated even in a collateral proceeding.

6. An absent defendant, against whom a decree has been made by default, has a right, under the twenty-first section of the Chancery act (*Rev. p. 107*), on showing a meritorious defence to an order permitting him to appear and answer the complainant's bill, provided he makes his application within the time limited by that section.

---

Consolidated Electric Storage Co. *v.* Atlantic Trust Co.

---

On application to open decree, heard on order to show cause and affidavits.

*Mr. Thomas N. McCarter*, for the application.

*Mr. Theodore Runyon*, contra.

VAN FLEET, V. C.

This is an application by the Atlantic Trust Company for an order opening a decree made against it on the 26th day of October, 1891. It asks that the decree may be opened, in order that it may show the complainant has no right to the relief which the decree gives. The decree adjudges that the Atlantic Trust Company has no beneficial interest in sixty thousand shares of the complainant's capital stock, which were transferred to it in 1890, not by the complainant but by other persons; that the complainant has a good present right to thirty thousand of the sixty thousand shares, and commands the trust company to deliver them to the complainant; and it also adjudges that the complainant is entitled to the other thirty thousand shares, subject, however, to a lien which it is unnecessary, for the purposes of this discussion, to describe. The trust company is a foreign corporation, having been created by a law of the State of New York. No jurisdiction was acquired over it, as a defendant in this suit, except such as was obtained by service of the notice, prescribed by an order of publication, on one of its head officers, at its office in the city of New York. But it is not disputed that the trust company had actual notice of the suit. Indeed, by its own proofs, it appears that, after being served with notice under the order of publication, it retained counsel in this state, more than a month before the time for answering had expired, for the purpose of being advised whether or not it should make defence, and that notwithstanding it was advised that, on the facts stated in the bill, no cause of action was shown against it, yet that it neither appeared to the suit nor defended it. A few days after the time limited by the order of publication, within which the defendant might appear and make defence, had ex-

Consolidated Electric Storage Co. *v.* Atlantic Trust Co.

.pired, a decree *pro confesso* was entered against it, and subse-.quently, on proofs taken *ex parte*, the decree in question was made.

The defendant insists that either one of the three following .grounds entitles it to the order it asks: *First,* that the bill shows no cause of action in favor of the complainant in respect to the subject-matter of the suit; *second,* that surprise and merits .have been shown, and, *third,* that an absent defendant, against whom a decree has been taken by default, has a right, by force of the twenty-first section of the Chancery act (*Rev. p. 107*), at .any time within three years from the making of such decree, if no notice in writing has been given to him of the decree, and .if it has, then, at any time within six months from the service of .such notice, to come in and make defence just as though no decree had been made, and that as against a decree thus obtained he is .not required to show that he has a meritorious defence, or that the decree is, in any respect, erroneous or unjust. No doubt, I .suppose, can be entertained that if, on an examination of the complainant's bill, and assuming every fact alleged in it to be true, it appears that no right of action against the defendant is .shown, the decree should not only be opened but vacated. If the complainant has no right of action, it has no right to a decree, .and to allow the decree to stand under such circumstances would .not be doing justice, but injustice. To allow this decree to stand, if it be true that it has no foundation in right, would constitute a flagrant abuse of judicial power, for the decree, as will have been observed, takes certain property from the defendant and gives it to the complainant. No court, whose duty it is to administer justice and prevent and correct wrong, can allow such a decree to stand.

The power of this court to open a decree on the ground first urged here, even in a case where the defendant has been regularly brought into court by the service of process, but has failed to make defence and has allowed the complainant to take a decree by default, is free from the least doubt. Prior to the enactment of what is now the twenty-eighth section of the Chancery act (*Rev. p. 109*), no decree, affecting the rights of a defendant, could

be made until he had appeared and answered. If he was contumacious and refused to answer, he could be compelled to do so, and in certain cases the court might order an appearance to be entered for him ; but until he had appeared to the suit, in the one mode or the other, no decree could be made affecting his rights. *Brinkerhoff* v. *Franklin, 6 C. E. Gr. 334, 336.* Now, however, by force of the statute just mentioned, if a defendant fails to appear and make defence, the chancellor may treat his failure as a confession of the truth of the facts stated in the complainant's bill, and may thereupon make such decree as shall, upon the facts stated in the bill, be deemed equitable and just ; or he may order the complainant to take testimony to prove the allegations of his bill, or he may examine the complainant under oath to ascertain their truth, and then, in either case, make such decree as he shall think equitable and just upon the facts stated in the bill. But decrees so made are subject to be opened, for cause, at any subsequent time. This statute, by proviso, expressly declares, "that to prevent fraud or mistake, the chancellor may, at any time, upon notice and sufficient cause shown, grant a rule staying proceedings and to open such decree." Precisely similar power is given to the chancellor over an absent defendant, who, after being brought into court by notice pursuant to an order of publication, makes no defence but allows a decree *pro confesso* to be taken against him. That is to say, the chancellor may, on the confession arising out of the default of such a defendant, or on testimony, or on the complainant's oath, make such decree against him as shall be equitable and just upon the facts stated in the complainant's bill. *Rev. p. 106 § 18.*

It is thus seen that the power conferred by these statutes is subject to a highly important and most salutary limitation ; the chancellor is only authorized to make such a decree against a defendant who makes default, as shall be equitable and just upon the facts stated in the bill. When the facts stated in a bill do not show, assuming them all to be true, that the complainant has a cause of action against the defendant, which is the proper subject of relief in equity, it is obvious that the bill contains nothing which can be made the foundation of a decree, and consequently

no decree can be founded on it which will be equitable and just. And if a decree should be made on a bill thus fatally defective, it would, as it seems to me, stand, in point of legal efficacy, precisely where a decree stands which is founded on a cause of action not stated in the bill. The doctrine is firmly settled that such a decree, or any judgment which is entirely outside of the cause of action specified in the pleadings in the suit in which it is pronounced, is invalid, and will be treated, even in a collateral proceeding, as a nullity. Such a judicial sentence is absolutely void and will be held to be a nullity everywhere. *Munday* v. *Vail, 5 Vr. 418; Reynolds* v. *Stockton, 140 U. S. 254.* In my judgment, no distinction, founded on either reason or justice, can be made between a decree founded on a bill which discloses no ground of action and a decree founded on a cause of action which is not averred in the bill. In each case, it will be noticed, that the fundamental defect is, that there is nothing in the bill to support the decree, and hence each is, so far as the record shows, without the least foundation.

The important question, then, on this branch of the case, is— Is it true that the bill shows no right of action in the complainant in respect to the subject-matter of the suit? The suit was brought to recover sixty thousand shares of the complainant's own stock. Those shares constituted the subject-matter of the suit. The following are the material averments of the bill : On the 10th day of April, 1890, and prior to the complainant's organization as a corporation, William Bracken and H. R. Waite held an option for the purchase of an exclusive license to make and sell storage batteries under patents granted to Charles F. Brush ; on the date just named, Bracken and Waite made a contract with Robert L. Belknap, in which it was recited, that certain parties, acting in the interest of Belknap, were about to organize the complainant as a corporation under the laws of this state, with a capital of $3,000,000, divided into one hundred and twenty thousand shares, of $25 each, for the purpose of making and selling storage batteries, and by which contract Bracken and Waite agreed that, when such corporation was formed, they would convey their option to it, on condition that the com-

plainant corporation would, in full consideration for such conveyance, issue and deliver to them all of its capital stock, amounting to $3,000,000. Bracken and Waite also agreed that, on the delivery to them of the one hundred and twenty thousand shares of the complainant's capital stock, they would deliver one hundred and ten thousand shares thereof to the Atlantic Trust Company. Belknap, on his part, agreed that he would provide and furnish to the Atlantic Trust Company all the money and securities required, by the terms of the option, to be paid and furnished for the purchase of the Brush license, amounting together to $165,000; also that he would provide a working capital for the complainant of at least $100,000; also at least $100,000 for the payment of the unfunded debts of the Julien Electric Traction Company, and also that he would provide for the payment, principal and interest, of one hundred and two first mortgage bonds of the last named corporation as the same fell due. It was also agreed, that sixty thousand of the one hundred and ten thousand shares of stock delivered by Bracken and Waite, to the Atlantic Trust Company, should be delivered to Belknap when he had performed his part of the contract, and that in the meantime, so long as he or his assigns complied with the terms of the contract, he or they should have the right to vote and draw dividends on the sixty thousand shares of stock. The contract gave Belknap the right to assign it to any person or corporation that should be acceptable to Bracken and Waite, and on his doing so, and upon his assignee assuming Belknap's liabilities under the contract, it was agreed that his liabilities should cease. The bill then avers that the complainant was created a corporation, and that the terms of the contract, which were to be performed by Bracken and Waite, were by them duly performed, and then, in the words of the bill, it is said, " that the capital stock of your orators, mentioned in said agreement, was created and issued in accordance with the terms and provisions of said agreement." The bill then shows that Belknap, with the assent of Bracken and Waite, assigned his contract to the United Electric Traction Company, and that that corporation assumed Belknap's liabilities under it. The bill also shows, that,

by virtue of such assignment, the traction company received the shares of stock which, by the contract, were to go to Belknap, and that of the sixty thousand shares, which had been delivered to the Atlantic Trust Company, thirty thousand were to be held as collateral security for the payment of one hundred and two bonds of the Julien Electric Traction Company, and the other thirty thousand were to be held on the condition mentioned in the contract respecting the furnishing of working capital for the complainant. The bill then charges that the United Electric Traction Company has, notwithstanding repeated requests and very persistent urging, neglected and failed to perform that part of the contract which required it to furnish working capital for the complainant, and the complainant prays, in consequence, that it may be decreed that the traction company has no right to the sixty thousand shares of stock, and that the Atlantic Trust Company shall deliver thirty thousand shares thereof to the complainant at once, and the remaining thirty thousand shares when the lien thereon shall have been discharged.

Bracken and Waite are not parties to this suit. They, by the terms of the contract with Belknap, were to receive all of the complainant's capital stock as the consideration for the conveyance by them of their option to the complainant. The contract in this respect has been executed. The bill expressly says, that Bracken and Waite conveyed their option to the complainant, and that the complainant's stock was issued to Bracken and Waite in accordance with the terms and provisions of their contract with Belknap. The bill thus expressly says, as plainly as words can say, that the whole of the complainant's stock was issued to Bracken and Waite in payment of the transfer by them to the complainant of their option to purchase a license under the Brush patents. By such issue, they become the absolute owners of the stock. The stock thereby became their private and exclusive property. It is not claimed or pretended that the stock was issued to them for the benefit of the complainant, nor that they hold it in trust for the complainant; on the contrary, it is explicitly stated that it was issued to them as the consideration for the transfer of their option to the complainant. They sub-

sequently, as the bill avers, pledged a part of the stock for the benefit of the complainant, and another part for the benefit of the Julian Electric Traction Company, but such pledge did not, either in equity or at law, change the title to the stock. The complainant thereby acquired no right whatever to the stock. The only right it acquired, by force of such pledge, was to take the fruits of the pledge. Bracken and Waite still remained the owners of the stock, subject to such lien as the pledgee might acquire by performing the terms of the contract of pledge. In this situation of affairs, it is plain, beyond question, that the refusal or failure of the pledgee to perform his contract gave the complainant no right or title to the stock pledged for its benefit. The only persons who can lawfully reclaim the stock, on the failure of the pledgee to perform his part of. the contract, are the pledgors. They made the contract of pledge, the title to the stock is in them, and hence they are the only persons who, in case the contract is broken, can maintain an action for the recovery of the stock. The complainant is without the least shred of title to the stock, yet the decree under review attempts to give to it not only the stock which was pledged for its benefit but also that which was pledged for the benefit of the Julien Electric Traction Company. No court has power to make such a decree on the facts alleged in the bill in this case.

But had it been shown that the title to the stock in controversy had been put in Bracken and Waite for the benefit of the complainant, so that Bracken and Waite were simply trustees and the complainant was the owner in equity of the stock, still, on the facts now before the court, I think the defendant would have been entitled to the order it asks. The bill admits that the complainant, before the commencement of its suit, had been informed that the defendant had advanced some money to the United Electric Traction Company on the stock in question and claimed to have a lien on it for its advances. The United Electric Traction Company, it will be remembered, is the corporation that succeeded to Belknap's rights, and also to his liabilities, under the contract made by him with Bracken and Waite, and it is the same corporation which, the bill says, received, by virtue of

the assignment of Belknap's contract to it, the stock that was, by that contract, to go to Belknap. One of the things that this contract required Belknap to do, in order to become entitled to the stock in controversy, was to provide the money and securities which, by the terms of the option granted to Bracken and Waite, were to be paid and furnished for the purchase of the Brush license. The United Electric Traction Company has performed this part of the contract. This is an undisputed fact in the case. This part of the contract was performed in this way: On the 4th day of June, 1890, the United Electric Traction Company made its note to the defendant, payable at six months, for $215,000, bearing interest from date at six per cent., and pledged the sixty thousand shares of stock in controversy, together with other securities, for the payment of the note. The defendant, on the delivery of the note, credited the traction company, on its book, with $215,000, and subsequently, on the same day, issued a certificate of deposit to the traction company for that sum ; the traction company then assigned the certificate of deposit to the defendant for the purpose of placing in its hands the $215,000 to answer the cash payments which the contract, under which the Brush license was granted, required to be made at once, or at a short day, and also to secure the payment of the minimum royalties which should subsequently accrue under that contract. The $215,000 were thus used for the purchase of the Brush license. It is also undisputed that the defendant, on the 2d day of June, 1890—two days prior to the date of the transactions just described—entered into a contract with the complainant and the corporation which then held the Brush patents, by which it acknowledged that $215,000 in cash had been placed in its hands to pay for the Brush license, $65,000 of which it promised to pay to the licensor, and the other $150,000 it promised to pay either to the licensor or to the complainant. And it is also a fact, about which there is no dispute, that the defendant has already paid out of this fund to the licensor nearly $85,000, and it appears, by its contract just mentioned, that it stands irrevocably bound to pay the whole balance either to the licensor or to the complainant. It thus appears that the defendant loaned the $215,000 in part on the security of the

sixty thousand shares of stock in controversy, and that it was by means of this loan that the complainant acquired the Brush license.

To the extent then of $215,000, it is undeniable, that the consideration, which Belknap agreed to pay for the sixty thousand shares of stock, has been paid. He agreed to pay about $467,000. Two hundred and fifteen thousand dollars of that sum has been paid and the complainant has had the whole benefit resulting from its payment. It acquired the Brush license by means of it. The bill makes no claim that the pledge of the stock to the defendant was unauthorized, or that such use of the stock constituted a fraudulent misappropriation of it. All it says, which refers in the most distant way to the pledge of the stock, is, that the complainant has been informed that the defendant had advanced some money on the stock and claimed a lien on it in consequence, and then denies that such lien exists. But none of the facts material to the validity of the pledge—as for example, showing for what purpose the stock had been pledged, how much money had been raised by its pledge, and what disposition had been made of the money—are alleged in the bill or were proved on the *ex parte* hearing. And yet these constituted the vital and controlling facts of the case. They are so fundamental as to make it entirely clear that, without knowledge of them, the court could not make a decree in the case that would do justice and prevent wrong. The result is, that the undisputed facts now before the court make it certain, in my judgment, that that part of the decree under examination, which adjudges that the defendant has no beneficial interest in the stock in controversy, is not just, nor right, nor true. A defence against the complainant's claim has been shown, which appears to me to be so strong in its justice and unquestionable in its truth, as to make it the plain duty of the court, even if it had been shown that the complainant was the owner of the stock in question, to give the defendant the opportunity to be heard in its defence, which is granted by the twenty-first section of the Chancery act. That section in substance provides, that in any case where a decree is made against an absent defendant, who has not appeared

to the suit, the chancellor may, on the petition of the defendant "touching the matter of the decree," presented within the prescribed period, and on the payment by the defendant of such costs as may be ordered, permit the defendant to appear and answer the complainant's bill, and then, in the words of the statute, "and thereupon such proceedings shall be had as if such absent defendant had appeared in due season and no decree had been made." It is unnecessary to discuss the question, whether this statute gives a defendant the right to appear and answer merely because he desires to do so, and regardless of whether he has or has not any ground of defence which is the fit subject of judicial investigation. Here a strong meritorious defence has been shown. There can be no doubt that such a case comes directly within both the letter and the spirit of the statute.

My conclusion, therefore, is, that even if it had been shown that the complainant was the owner of the stock in question, the defendant would, nevertheless, on the facts now before the court, have been entitled to an order permitting him to appear and answer the complainant's bill. But more extensive relief must be given in this case. As the decree in question is founded on a bill which fails to show that the complainant has any cause of action against the defendant, it is plain that nothing short of an absolute vacation of the decree will answer the purposes of justice.

The decree will be set aside.